IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES R. PEARSON, | ) | CASE NO. 5:11CV1502 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff James R. Pearson ("Plaintiff" or "Pearson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423.  Doc. 1.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  As set forth below, the ALJ failed properly to evaluate the opinion of Pearson's treating physician.  Therefore, the final decision of the Commissioner should be **REVERSED and REMANDED.**

## I.  Procedural History

On January 5, 2008, Pearson filed an application for DIB, alleging a disability onset date of August 7, 2003.  Tr. 112-13.  Pearson claimed that he was disabled due to a combination of impairments, including back injury, degenerative disc disease, arthritis, joint pain, depression, and opiate dependence as a result of his back injury.  Tr. 96.  The state agency denied Pearson's claim initially and upon reconsideration, and Pearson timely requested a hearing before an administrative law judge.  Tr. 36-37, 90-93, 96-102.  On April 8, 2010, Administrative Law Judge Dennis LeBlanc (the "ALJ") held a hearing.  Tr. 43-87.  On May 27, 2010 the ALJ issued

1

a decision finding that Pearson was not disabled from August 7, 2003, the alleged onset date, through December 31, 2008, Pearson's date last insured.  Tr. 11-22.  Pearson requested review of the ALJ's decision by the Appeals Council on June 23, 2010.  Tr. 7.  On May 27, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II.  Evidence

### A.    Background

Pearson was born on November 25, 1969, and was thirty-eight (38) years old at the time of his DIB application.  Tr. 119.  He graduated from high school in 1989.  Tr. 132.  At the time of the administrative hearing, he lived alone but his kids visited him every other weekend and stayed with him during the summer.  Tr. 72-73.

### B.    Medical Evidence

The ALJ set forth an extensive summary of the medical evidence in his decision (Tr. 16-19) and no party has objected to the ALJ's summary of that evidence.  Accordingly, the Court will not duplicate the efforts of the ALJ and hereby incorporates by reference the ALJ's general summary of medical evidence.  Tr. 16-19.  The discussion of the medical evidence in this Report & Recommendation shall focus on the evidence pertinent to the issues on appeal.

#### 1.    Treating Physicians

Pearson was treated by Christopher Durner, D.O., for his mental health issues since February 14, 2008.  Doc. 14, p. 13.  Pearson saw Dr. Durner numerous times between September 18, 2008 and August 13, 2009, and Dr. Durner diagnosed Pearson with anxiety disorder and cannabis dependence in remission.  Tr. 1313-1327.  On March 10, 2010, Dr. Durner completed a mental RFC assessment for Pearson.  Tr. 1385-87.  Dr. Durner opined that Pearson had poor to

no ability to maintain attention for a two-hour segment; poor to no ability to maintain regular attendance and be punctual; poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods; and poor to no ability to interact appropriately with the general public.  Tr. 1385-87.  Dr. Durner explained his opinion by stating "[Pearson] has extreme episodes of pain that are very distracting. This pain is always present and reduces attention . . . ."  Tr. 1385-1387.  He also opined that Pearson would be absent from work approximately twice a month.  Tr. 1387. Dr. Durner noted that the onset for impairment at this severity was July 2008.  Tr. 1387.

N.V. Rimedio, D.O., was Pearson's primary care physician, and treated Pearson from at least March 2001 through March 15, 2010.  Tr. 1185.  Pearson saw Dr. Rimedio for his back condition since 2002.  Tr. 51-52.  On March 15, 2010, Dr. Rimedio completed a physical RFC assessment for Pearson.  Tr. 1389.  He opined that Pearson could frequently lift or carry 10 to 20 pounds; occasionally lift up to 50 pounds; stand and walk for one hour, as long as he was permitted to rest.  Tr. 1389.  Dr. Rimedio also opined that Pearson could sit for two hours, as long as he could rest; frequently squat; frequently use his arms for work above shoulder level; occasionally bend; occasionally climb and use hands above shoulder level; and never crawl.  Tr. 1389.  He further opined that Pearson would miss work more than 3 times per month.  Tr. 1389. Dr. Rimedio stated that the onset of the current disability was September 28, 2000.  Tr. 1389.

2.      **State Agency Physicians**

In March 2008, state agency physician Alice Chambly, Psy.D., reviewed Pearson's mental health records and assessed Pearson's mental residual functional capacity ("RFC").  Tr. 1223-39.  Dr. Chambly noted that Pearson had a history of chronic low back pain, surgery, and depression.  Tr. 1239.  She concluded that Pearson was still capable of comprehending,

remembering, and carrying out a variety of simple and some complex tasks; engaging in simple social interactions that did not require resolving conflicts or supervising others; and working at a reasonable pace in work settings that did not require strict production goals.  Tr. 1239.

On April 16, 2008, Pearson underwent a consultative evaluation with state agency physician Paul T. Scheatzle, D.O.  Tr. 1282-83.  Pearson reported that he had been in pain since he slipped and fell at work in 2000.  Tr. 1282.  Approximately a year after his injury, he underwent back surgery.  Tr. 1282.  Pearson stated his pain returned and that he had another surgery in 2003.  Tr. 1282.  He reported that his treatment included multiple injections, nerve blocks, and a spinal cord stimulator.  Tr. 1282.  Pearson denied that he used marijuana, drank alcohol or consumed tobacco.  Tr. 1282.  He complained that he had constant pain in his lower back that radiated to his left leg and that sitting and standing made the pain worse.  Tr. 1282.  Dr. Scheatzle's examination revealed flattening in Pearson's lumbar lordosis, muscle spasms, and tenderness in the joints.  Tr. 1283.  Pearson had decreased sensation in his left leg, decreased range of motion in the lumbar spine, and positive straight leg raise on the left.  Tr. 1283. However, Dr. Scheatzle noted that Pearson had normal muscle tone, no atrophy, and 4/5 strength in his lower extremities.  Tr. 1283.  Dr. Scheatzle's impression was post laminectomy syndrome, chronic low back pain, and leg radiculitis.  Tr. 1283.

Dr. Scheatzle opined that Pearson could sit frequently and stand occasionally, but would have to change positions every thirty minutes.  Tr. 1283.  He also opined that Pearson could walk 150 feet before he needed to stop and rest; lift at a sedentary level, which he defined at ten pounds occasionally; and carry a couple of pounds.  Tr. 1283.  Dr. Scheatzle found that Pearson should avoid climbing, crawling, bending or twisting.  Tr. 1283.  Dr. Scheatzle also noted that Pearson's concentration was mildly impaired when he was on pain medication but that his

memory was within normal limits.  Tr. 1283.

On May 14, 2008, state agency physician William Bolz, M.D., reviewed Pearson's

medical records and assessed his physical RFC.  Tr. 1290-97.  Dr. Bolz concluded that Pearson

could perform light work[1] but needed to alternate between sitting and standing to relieve his pain

or discomfort.  Tr. 1291.  Dr. Bolz rejected Dr. Scheatzle's finding that Pearson could only lift

10 pounds and carry a couple of pounds.  Tr. 1296.  Dr. Bolz stated that Dr. Scheatzle's findings

were not supported by the evidence and were inconsistent with Pearson's own statement that he

could lift 15 pounds.  Tr. 1296.  He also noted that Pearson's activities, which included mowing

grass, doing laundry, washing cars, and playing baseball with his son, were inconsistent with a

sedentary limitation.  Tr. 1296.  Dr. Bolz concluded that Pearson's symptoms were attributable to

a medically determinable impairment but noted that the alleged severity and limitations were not

supported by the totality of evidence.  Tr. 1295.

## C.    Pearson's Written Statements to the State Agency

In February 2008, Pearson provided the state agency with written statements regarding

his symptoms and their impact on his ability to perform daily activities.  Tr. 166-77.  Pearson

reported that his symptoms affected his ability to stand, walk, sit, and use his hands.  Tr. 171.  He

also complained that he had difficulty understanding things, following instructions,

concentrating, and remembering things.  Tr. 171.  However, he reported that he took care of his

daughter, did some housework, and took care of several pets including a dog, two birds and a

fish.  Tr. 167.  Pearson stated that his son and wife helped him take care of the pets.  Tr. 167.  He

also reported that he had difficulties taking care of his personal needs (Tr. 168) but was able to

---

[1] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing
up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg
controls." 20 C.F.R. § 404.1567(b).

prepare simple meals, mow the lawn, do laundry, wash the car, do dishes, and do some of the household chores.  Tr. 169.  Pearson stated that he rarely went outside in the winter but often went out in the summer.  Tr. 169.  He also reported that he drove a car, shopped in stores, went fishing, played a little baseball with his son, visited family and friends, and regularly attended his son's sporting events.  Tr. 169-70.

**D.     Administrative Hearing**

**1.     Pearson's Testimony**

On April 8, 2010, Pearson appeared with counsel and testified at the administrative hearing.  Tr. 62-78.  He discussed his prior work history as a carpenter.  Tr. 62-63.  He stated that he worked for the same company for approximately 15 years.  Tr. 63.  He stated that he left his job as a carpenter because of his pain.  Tr. 62.

Pearson then described his back impairment and his pain.  Tr. 64-65.  He stated that he had pain that shot down both legs and to the heels of his feet.  Tr. 64.  Pearson believed that he had five surgeries on his back.  Tr. 65.  He stated that his most recent surgery was a revision procedure for a nerve stimulator that was implanted into his back.  Tr. 65.  Pearson stated that, on a typical day, his pain is a 7 on a scale of 1 to 10.  Tr. 66.  He stated that he could lift and carry 15 to 20 pounds without pain.  Tr. 66.  He stated that he could stand for about a half hour to an hour, and that standing was better than sitting.  Tr. 68.  Pearson testified that he could walk around the block once or twice.  Tr. 68.  He stated that he used marijuana four days prior to the hearing because he ran out of his pain pills.  Tr. 68.  Pearson also discussed his mental impairments.  Tr. 69-70.  He stated that he had problems with concentration and his memory.  Tr. 69.  Pearson stated that he had been hospitalized for mental problems.  Tr. 70.  Pearson stated that these problems had occurred in 2008 when he went off all of his pain medications.  Tr. 70.

Finally, Pearson described his activities of daily living.  On an average day, he stated that he would try to do things around the house, such as cleaning but would also get help from his family.  Tr. 66.  He stated that he cooked for himself and mainly prepared TV dinners and microwave dinners.  Tr. 71.  He stated that he picks his kids up from school but did not drive to the hearing because it was too great a distance with his back pain.  Tr. 73-74.

### 2.      Medical Expert's Testimony

Hershel Goren, M.D., appeared at the hearing and testified as the medical expert ("ME").  Tr. 52-62.  He testified that he reviewed all of the evidence in Pearson's record and summarized Pearson's treatment as involving several back surgeries, the insertion of a spinal cord stimulator, and treatment by psychologists and psychiatrists.  Tr. 54-55.  The ME also pointed out that there was evidence that Pearson abused substances, including opiates and cannabis.  Tr. 56.

The ME discussed the opinions of Pearson's treating physicians.  First, the ME noted that Dr. Rimedio, Pearson's family physician, provided an opinion in March 2010 indicating that Pearson had light to medium limitations.  Tr. 55.  The ME testified that he could not locate any evidence in the record that Dr. Rimedio had provided enough of an explanation to come to that conclusion.  Tr. 55.  The ME stated that the most he could find was a treatment note dated February 1, 2010, but that it was not relevant to Pearson's back pain.  Tr. 55.  The ME also discussed the opinion of Pearson's psychiatrist, Dr. Durner.  Tr. 56.  He explained that Dr. Durner's opinion was conclusory and also questionable in light of his previous treatment note which indicated that Pearson had a Global Assessment Functioning (GAF) score of 70.[2]  Tr. 56.

---

[2] GAF considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

The ME opined that Pearson did not have an impairment or combination of impairments that met or equaled a listed impairment.  Tr. 56-57.  He also opined that Pearson retained the capacity to lift or carry 20 pounds occasionally and 10 pounds frequently; and could never use a ladder, rope or scaffold; occasionally use a ramp or stairs; occasionally stoop, kneel, crouch and crawl; and never be around unprotected heights.  Tr. 57.  The ME stated that Pearson should be limited to jobs that did not require high production quotas, which he defined as assembly line or piece-rate work.  Tr. 57.

### 3.    Vocational Expert's Testimony

Lynn Smith appeared at the hearing and testified as a vocational expert (the "VE").  Tr. 78-85.  She stated that Pearson had previously worked as a carpenter (semi-skilled position at a heavy exertional level).  Tr. 79.  The ALJ then asked the VE whether a hypothetical individual with Pearson's vocational characteristics and the following limitations could perform Pearson's past work or any other work in the national economy:

> Able to lift and/or carry 20 pounds occasionally, 10 pounds frequently and walk for 6 hours of an 8-hour day, sit for 6 hours of an 8-hour day.  Can occasionally climb ramps and stairs, but no ladders, ropes or scaffolds.  Can occasionally stoop, kneel, crouch and crawl.  Needs to avoid hazards such as dangerous machinery or unprotected heights, is able to perform simple and routine tasks, but not in a fast-paced production environment such as on an assembly line.

Tr. 80.  The VE testified that an individual with the specified characteristics could not perform Pearson's past work (Tr. 80) but could perform other jobs in the national economy, including laundry worker (30,000 jobs in Ohio and 887,000 jobs nationally), mail clerk (3,000 jobs in Ohio and 110,000 jobs nationally), and ticket seller (140,000 jobs in Ohio and 2.4 million jobs nationally).  Tr. 80-81.  In a second hypothetical, the ALJ modified the limitations to include an individual who could sit for a total of two hours in an 8-hour day, for no more than 15 minutes at a time.  Tr. 81.  The VE testified that the individual could not perform the laundry worker job but

could perform the mail clerk and ticket seller positions.  Tr. 82.

On cross examination, the VE stated that employer tolerance for being off task in a given day would be between five (5) and ten (10) percent.  Tr. 83.  The VE also testified that, if an individual was off task for more than ten (10) percent of a work day due to pain, there would be no jobs available for that individual.  Tr. 83-84.  The VE also opined that employer tolerance for missing work would be two days a month and that an employer would not tolerate an individual who missed work three times a month.  Tr. 84.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe

9

impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).   Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

Before undertaking the sequential evaluation, the ALJ determined that Pearson met the insured status requirements through December 31, 2008.  Tr. 13.  At Step One, the ALJ determined that Pearson had not engaged in substantial gainful activity during the period from his alleged onset date of August 7, 2003, through his date last insured.  Tr. 13.  At Step Two, the ALJ determined that Pearson had the following severe impairments: degenerative disc disease of the lumbar spine status/post surgery, depression, and anxiety.  Tr. 13.  At Step Three, the ALJ found that Pearson did not have an impairment or combination of impairments that met or

medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[3]  Tr. 13.

The ALJ then determined Pearson's RFC and found that he could do light work subject to the

following limitations:

> [C]an only sit for a total of 2 hours during an 8-hour day, but for no more than 15
> minutes at a time.  He can stand and/or walk for 6 hours of an 8-hour workday.
> He can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He can
> only occasionally climb ramps/stairs, but no ladders, ropes or scaffolds.  He can
> occasionally stoop, kneel, crouch or crawl.  He needs to avoid hazards such as
> dangerous machinery and unprotected heights.  He is able to perform simple and
> routine tasks, but not in a fast [paced] production environment such as on an
> assembly line.  He can only interact superficially with co-workers and the public
> throughout the day.

Tr. 15.  At Step Four, the ALJ found that Pearson could not perform his past relevant work.  Tr.

20.  Finally, at Step Five, the ALJ relied upon Rule 202.21 of the Medical-Vocational

Guidelines[4] (the "Grid") as a framework for his decision-making, coupled with the VE's

testimony, and concluded that Pearson could perform jobs that existed in significant numbers in

the national economy.  Tr. 21.  The ALJ therefore found that Pearson was not disabled during the

relevant time period.  Tr. 21-22.

## V.  Arguments of the Parties

Pearson objects to the ALJ's decision on three related grounds.  First, he argues that the

ALJ erred by not giving appropriate weight to the opinions of two of his treating physicians.

Second, Pearson contends that the ALJ erred by cherry-picking the record in making his RFC

determination.  Third, Pearson asserts that the ALJ erred by finding an RFC that was not

---

[3]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

[4]  The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix
2 (the "Grid"). The Grid is composed of Rules 200.01-204.00.  *Id.*  The Grid includes rules that may be applied in
cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable
impairment from doing vocationally relevant past work.  20 C.F.R. § 404.1569.  However, the rules contained in the
Grid do not cover all possible variations.  *Id.*

supported by substantial evidence and by adopting the VE's testimony that was in response to a hypothetical that did not accurately describe his limitations.  Doc. 14, p. 1.

In response, the Commissioner argues that the ALJ properly evaluated the opinions of Pearson's treating physicians.  The Commissioner also argues that the ALJ did not cherry-pick the evidence, but rather appropriately assessed and weighed the evidence of record, and that the ALJ's RFC determination is supported by substantial evidence.  Lastly, the Commissioner asserts that the ALJ's hypothetical to the VE accurately portrayed Pearson's limitations. Doc. 16.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.      **Medical Source Opinions**

Pearson argues that the ALJ failed to follow the treating physician rule in evaluating the opinions of Dr. Rimedio, his primary care physician, and Dr. Durner, his psychiatrist.  Doc. 14, pp.  11-15.  Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x. 802, 804 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

1.      **The ALJ Failed Properly to Evaluate the Opinion of Dr. Rimedio**

Dr. Rimedio was Pearson's primary care physician from at least March 2001 through March 15, 2010.  Tr. 1185. On March 15, 2010, Dr. Rimedio provided an assessment of Pearson's physical RFC and opined that Pearson could frequently lift or carry 10 to 20 pounds; occasionally lift up to 50 pounds; and stand and walk for one hour, as long as he was permitted to rest.  Tr. 1389.  Dr. Rimedio also opined that Pearson could sit for two hours, as long as he could rest; frequently squat; frequently use his arms for work above shoulder level; occasionally bend; occasionally climb and use hands above shoulder level; and never crawl.  Tr. 1389.  He further opined that Pearson would miss work more than 3 times per month.  Tr. 1389.

Pearson argues that the ALJ failed to properly evaluate the opinion of Dr. Rimedio.  Doc. 14, pp. 11-13.  Specifically, Pearson asserts that the ALJ not only failed to give good reasons for not affording controlling weight to the opinion of Dr. Rimedio, but also failed to assign the opinion any degree of weight whatsoever or give any reasons for rejecting or accepting this opinion.   Doc. 14, p. 11.

Upon review, the undersigned concludes that the ALJ's treatment of Dr. Rimedio's opinion was inadequate under the treating physician rule and necessitates remand.  The ALJ never identified Dr. Rimedio by name, misidentified Dr. Rimedio's opinion as being from a pain management physician, and only discussed part of Dr. Rimedio's findings.  Tr. 18.  In addressing Dr. Rimedio's opinion, the ALJ stated:

> On March 15, 2010, Mr. Pearson's pain management doctor reported on his physical ability to perform work-related activity.  The doctor noted that Mr. Pearson could frequently lift and/or carry up to 20 pounds and occasionally up to 50 pounds.  Mr. Pearson could sit continuously for 2 hours, stand continuously for one hour and walk continuously for one hour, during an 8-hour workday.

Tr. 18.  The ALJ omitted the portion of Dr. Rimedio's opinion that Pearson would miss work

14

more than 3 times a month due to his condition. Tr. 1389.

More importantly, the ALJ failed to assign any degree of weight to Dr. Rimedio's opinion or provide any reasons for rejecting or accepting his findings.  Tr. 18.  Pursuant to the treating physician rule, Dr. Rimedio's opinions with regard to Pearson's functional abilities were entitled to controlling weight as long as they were medically supported and were consistent with the other evidence in the record.  *Wilson*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  An ALJ's failure to identify the reasons for discounting a treating source's opinion and to explain precisely how those reasons affected the weight given to the treating source's opinion signifies a lack of substantial evidence. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 407 (6th Cir. 2009).  This holds true even where the conclusion of the ALJ may be justified based upon the record.  *Id.*  The Sixth Circuit has repeatedly cautioned that courts "will not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion, and . . . will continue remanding when encounter[ing] opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545).  Here, the ALJ's failure to provide any explanation as to what weight he gave Dr. Rimedio's opinion and his failure to give good reasons for disregarding that opinion are procedural errors that denote a lack of substantial evidence for the ALJ's decision.  Remand is therefore appropriate so that the ALJ can properly evaluate Dr. Rimedio's opinion under the treating physician rule.

Notwithstanding the foregoing, the Commissioner argues that remand is unnecessary because (1) any error made by the ALJ was harmless and (2) the outcome on remand would not be different because Dr. Rimedio's opinion was patently deficient as it was not supported by any

clinical findings or laboratory tests.  Doc. 16, p. 11 (citing *Wilson*, 378 F.3d at 547).  These

interrelated arguments are unpersuasive.  Application of harmless error may be appropriate

where the review of a decision as a whole leads to the conclusion that no reasonable fact finder,

following the correct procedure, could have resolved the factual matter in another manner.  *See*

*Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 64298, *26-27 (N.D. Ohio June 17,

2011).  Dr. Rimedio treated Pearson for at least 9 years, from 2001 to the date of his opinion on

March 15, 2010.  Dr. Rimedio found specific functional limitations for Pearson, including that he

could only stand and walk for 1 hour and could only sit for 2 hours.  If these findings are entitled

to controlling weight, they might change the outcome of this case under the sequential analysis.

Here, the ALJ found that Pearson retained the ability to do light work, which requires a person to

be able to stand/walk for 6 hours.  If the ALJ were required to give controlling weight to Dr.

Rimedio's opinion that Pearson could only stand/walk for 1 hour, that would significantly

change the ALJ's finding as to Pearson's RFC and the ALJ's subsequent analysis under the

sequential evaluation.  Similarly, Dr. Rimedio opined that Pearson would miss work more than 3

times per month because of his impairments.  If this opinion is given controlling weight, it would

change the outcome at Step Five based on the testimony of the VE that an employer's tolerance

for an employee missing work would be 2 days per month.  Tr. 84.  The ALJ's failure to explain

what weight he gave to Dr. Rimedio's opinions or what impact those opinions had on his RFC

determination and ultimate decision of non-disability was prejudicial to Pearson.  The

Commissioner's *post hoc* rationale is not a sufficient substitute for a reasoned analysis by the

ALJ in this case.  Finally, upon review of the record, it cannot be said that no reasonable

administrative fact finder, applying the treating physician rule to the opinions of Dr. Rimedio,

could have reached a different outcome than the ALJ here did with regard to Pearson's RFC and,

ultimately, the determination as to whether he was disabled.

Finally, the Commissioner argues that Dr. Rimedio's opinion does not apply to the relevant time period because it was provided in March 2010, after Pearson's date last insured. Doc. 16, p. 10. This argument is also without merit because, while the opinion was provided after the date last insured, it relates back to a period before that date. Pearson's date last insured was December 31, 2008 and, as such, he had to show that he became disabled on or before that date. Tr. 11. *See also Cunningham v. Astrue*, 360 Fed. App'x. 606, 608-09 (6th Cir. 2010) ("Cunningham's date last insured was June 30, 2003; therefore, in order for Cunningham to be entitled to DIB, the evidence must demonstrate that he had a disability that began on or before June 20, 2003."). Consequently, to be relevant to the disability decision, evidence from after the expiration of insurance "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec*., 87 Fed. App'x 478, 480 (6th Cir. 2003). In this case, the opinion of Dr. Rimedio does relate back to the period before Pearson's date last insured. Indeed, in his opinion, Dr. Rimedio's specifically states, "Onset of current disability: 9-28-2000," which is before Pearson's date last insured. Tr. 1389. If the ALJ in fact discounted Dr. Rimedio's opinion because he found that it did not relate back to the relevant period, then he should have given that explanation in his decision; he did not. Again, the Commissioner's *post hoc* rationalization is not persuasive in this case.

In sum, the ALJ failed to follow the treating physician rule because he did not assign any weight to the opinion of Dr. Rimedio or provide any good reasons for discounting that opinion. The ALJ's failure to explain his decision with regard to the opinion of Dr. Rimedio has, in turn, deprived the Court of the ability to conduct a meaningful review of the ALJ's decision. Accordingly, the undersigned recommends that the case should be remanded for proper

application of the treating physician rule to Dr. Rimedio's March 2010 opinion.

**2.     The ALJ Properly Evaluated the Opinion of Dr. Durner**

Pearson also argues that the ALJ improperly assessed the opinion of Dr. Durner, his

psychiatrist, whom he treated with since February 14, 2008.  Doc. 14, p. 13.  On March 10, 2010,

Dr. Durner assessed Pearson's mental limitations and opined that Pearson had poor to no ability

to maintain attention for a two-hour segment; poor to no ability to maintain regular attendance

and be punctual; poor to no ability to perform at a consistent pace without an unreasonable

number and length of rest periods; and poor to no ability to interact appropriately with the

general public.  Tr. 1385-87.  Dr. Durner also opined that Pearson's limitations would cause him

to be absent from work approximately two times a month.  Tr. 1386-87.  The ALJ evaluated Dr.

Durner's opinion and concluded that it was entitled to little weight.  Tr. 19.

The ALJ explained that he gave less than controlling weight to Dr. Durner's opinion

because it was inconsistent with Pearson's reports of an increase in functioning and was also

inconsistent with Dr. Durner's own treatment notes.  For example, the ALJ noted that Dr.

Durner's treatment notes showed that, as late as August 2009, Pearson's medication was

effective in controlling his symptoms.  Tr. 19.  The ALJ's explanation demonstrates that he

properly considered the controlling regulatory factors and discounted Dr. Durner's opinion based

on the supportability of his opinion and the consistency of his opinion with the evidence of

record.  The ALJ therefore stated good reasons for assigning less than controlling weight to Dr.

Durner's opinion and fulfilled his obligations under the regulations.  *See, e.g., Allen v. Comm'r

of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for

discounting treating physician opinion where the ALJ's stated reason was brief but reached

several of the factors an ALJ must consider when determining what weight to give non-

controlling opinion); *Bledsoe v. Barnhart*, 2006 WL 229795, at *4 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.' This is a specific reason for not affording controlling weight to Dr. Lin.").

A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Durner's opinion are supported by substantial evidence. First, Pearson participated in a variety of activities that the ALJ found to be inconsistent with the severe limitations set forth by Dr. Durner. For example, Pearson reported that he mowed the grass, did the laundry, washed cars, shopped in stores, and played baseball with his son. Tr. 169. He also stated that he could prepare simple meals, do dishes, drive a car, and go fishing. Tr. 169-70. Second, there is evidence in the record, including Dr. Durner's own treatment notes, that Pearson's medications effectively controlled his symptoms. On December 12, 2008, Dr. Durner noted that Pearson reported that "he is dealing with his pain quite effectively and has managed to even get involved in Aquatic Therapy." Tr. 1323. On August 13, 2009, Pearson reported to Dr. Durner that his medications had been fairly effective, that he did not have any major side effects from the medication, and that he found benefits from all of the medications including Ritalin. Tr. 1313. Further, on June 15, 2009, Amanda Singer, APRN, BC, a nurse who worked with Pearson at Summa Health Systems, reported that Pearson stated that his medications were "working well." Tr. 1354. And on September 15, 2008 and November 9, 2009, Ms. Singer noted that Pearson's pain medication was effective in relieving his pain. Tr. 1348, 1365. This evidence supports the ALJ's determination to give less than controlling weight to Dr. Durner's opinion.

The ME's testimony also supports the ALJ's decision to discount Dr. Durner's opinion. Tr. 1148-55, 626. The ME acknowledged that some individuals with pain have concentration

problems, but specifically testified that "some don't." Tr. 58-59.  The ME never stated that Pearson had disabling concentration problems.  Further, when commenting on Dr. Durner's opinion, the ME explained that Dr. Durner's opinion was conclusory and was also questionable in light of his previous treatment note which indicated that Pearson had a GAF score of 70.  Tr. 56.  The ME testified that he "[did] not know when the claimant went from doing very well to – on an evidentiary record, to doing very poorly on a conclusory record."  Tr. 56.  The ME opined that Pearson retained the RFC to perform light work with several restrictions.  Tr. 57.  This evidence also supports the ALJ's determination to give less than controlling weight to Dr. Durner's opinion.

Overall, the ALJ applied the correct legal standard and provided good reasons for assigning less than controlling weight to the opinion of Dr. Durner.  Substantial evidence supports this determination.  Accordingly, the ALJ did not violate the treating physician rule.

## B. Other Issues

Pearson argues that the ALJ improperly "cherry-picked" from the record by citing evidence that portrayed Pearson's condition in a positive light.  Doc. 14, p. 15 (citing Tr. 18).  Pearson contends that there is evidence in the record to support a different, more restrictive RFC and, ultimately, a finding of disability.  This Report and Recommendation does not address Pearson's argument because, on remand, the ALJ's evaluation of the opinion of Dr. Rimedio under the treating physician rule may impact his findings with regard to Pearson's RFC, as well as his findings under the remaining steps of the sequential analysis.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability

20

evaluation).  Pearson's final argument is that the ALJ erred under Step Five of the sequential

analysis because his hypothetical question to the VE did not accurately portray Pearson's

limitations.  Doc. 14, p. 17.  For the same reason set forth above, this Report and

Recommendation does not address Pearson's Step Five argument.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner denying Plaintiff James R.

Pearson's application for Disability Insurance Benefits is not supported by substantial evidence.

Accordingly, the decision of the Commissioner should be REVERSED and the case

REMANDED for further proceedings consistent with this Report and Recommendation.[5]

Dated: June 25, 2012

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[5]  This recommendation should not be construed as requiring a determination on remand that Pearson is in fact
disabled.